```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
                     EASTERN DIVISION
```

Mark Grant,                     :

    Plaintiff,               :

v.                              : Case No. 2:10-cv-823

Target Corporation, et al.      : Magistrate Judge Kemp

    Defendants.              :

<u>OPINION AND ORDER</u>

    This employment discrimination case is before the Court to consider the motion for summary judgment filed by defendant Target Corporation. Also pending before the Court are several other motions including Target's motion to dismiss, two motions to strike filed by Target, and a motion to compel filed by plaintiff Mark Grant. These motions have been fully briefed. For the following reasons, the motion for summary judgment (#87), the motion to dismiss (#77), and the motion to strike (#93) will be granted. The motion to compel (#84) and the motion to strike (#85) will be denied as moot.

    I.  <u>Factual Background</u>

    The following facts are undisputed and are taken from Mr. Grant's deposition and the affidavits and exhibits submitted by Target. Target hired Mr. Grant in May, 2004 for a full-time position as an inbound warehouse worker. Deposition of Mark Grant, pp. 52, 82-85. Mr. Grant worked the A-2 shift from 6:00 p.m. to 6:00 a.m. on Friday through Monday. <u>Id</u>. at 87-88. He also worked overtime on other shifts. <u>Id</u>. He was supervised by various group leaders including Mark Nealon, Aaron Young, and Dustin Havenar. Affidavit of Mark Nealon, Exhibit 1. During his employment at Target, he was recognized by his group leaders for

his knowledge, training efforts, and teamwork.  Id.  Target measures its employees' performance in six categories - safety, quality, teamwork, reliability, productivity, and job knowledge.

Target utilizes a multi-step corrective action process to address concerns relating to an employee's performance.  In January 2006, Target issued to Mr. Grant a written "Confidential Corrective Action Report - Unsatisfactory Performance" based on his "negative reliability trend" resulting from excessive absences.  Grant Dep. Exh. K.  In 2007, Mr. Grant received five verbal "coachings" which resulted in a written "counseling" for unsatisfactory performance in October, 2007.  Id. at 271-273, 275, Exhibit J.  The written notice warned Mr. Grant that additional performance issues could lead to termination.  Affidavit of Sarah Mulloy, Exh. 1.  In December, 2007, Mr. Grant received a "written warning" for unsatisfactory performance for attendance issues.  Id. at ¶7 and Exh. 1.  Again, Mr. Grant was warned in writing that failure to maintain at least satisfactory performance would result in further corrective action including the possibility of termination.  Id. In July, 2008, Mr. Grant received a "final" written warning for unsatisfactory performance as a result of additional absences or tardiness.  Id.  At the same time, Mr. Grant received a "final" written warning for multiple violations for receiving three corrective actions in a rolling one-year period. Id., Exh. 2.

According to Target's policy and practice, any employee who receives three corrective action steps - counseling, written warning or final warning - in a rolling one-year period of time will receive a final warning for multiple violations.  Mulloy Aff., Exh. 2).  A fourth corrective action in the following twelve months - for any reason relating to the six performance categories - results in the employee's termination.  Id.  That is, the offense triggering the employee's termination is not

2

required to be related to the prior reasons for discipline. Mulloy Aff. at ¶5.  As explained below, in Mr. Grant's case, although his corrective action steps related to his attendance issues, his termination resulted from a productivity issue.

The final warning for three corrective actions, or multiple violations, received by Mr. Grant stated:

> Mark, on 1/1/07 you received a Counseling Corrective Action for Unsatisfactory Work Performance.  On 12/8/07 you received a Written Warning Correction Action for Unsatisfactory Work Performance.  On today 7/6/08 you received a Final Warning Corrective Action for Unsatisfactory Work Performance.  You have received 3 corrective actions in a rolling one-year period, resulting in this final warning for multiple violations.
>
> Mark, you must recognize the impact your performance and conduct have on the organization of our working environment.  You are expected to follow all policies and procedures and not deviate from established standards without prior approval.  If you feel you need additional clarification of policies and procedures, it is your responsibility to seek out this information from your Group Leader.  Failure to meet this improvement will lead to further disciplinary action up to and including termination.

Mulloy Aff. ¶8 and Exh. 2.

After receiving this final warning, Mr. Grant continued to be warned by his supervisors about various productivity issues. Grant Dep. at pp. 304, 316-318, 320; Nealon Aff. ¶8 and Exh. 1. On January 24, 2009, Mr. Grant was given a work assignment which, according to Target's guidelines, should have taken five hours to complete.  Nealon Aff., ¶9.  Mr. Grant took eleven hours to complete the assignment, resulting in a thirty percent productivity level.  <u>Id</u>. at ¶¶11-12.  This productivity level and work performance resulted in Mr. Grant's termination the next day.  Mulloy Aff. Ex. 3; Nealon Aff. ¶14.

Mr. Grant appealed his discharge and selected the four

members of the appeal panel from a list provided by Target. Grant depo, p. 334-336.  The panel unanimously upheld Mr. Grant's discharge.  Id. at 336-337.

In July, 2007, Mr. Grant noticed, on two different occasions, racial graffiti in the men's restroom.  Grant Depo., pp. 197, 209-211, 225-229; Exhs. H and I; Affidavit of Ken Woodring ¶5 and Exh. 1.  Mr. Grant reported this graffiti to a supervisor who directed him to report it to the human resources department.  Mr. Grant met with a human resources representative and was told Target would conduct an investigation.  Id.  These 2007 graffiti incidents were isolated and Target was unable to identify the vandal so no further action was taken.  Woodring Aff. at ¶5.  Additional incidents occurred in April and May, 2008.  Id. at ¶6. Following the 2008 incidents, Target was able to identify the employee responsible and ultimately terminated that employee.  Id. at ¶7.

Following his termination, Mr. Grant filed a charge with the EEOC.  Grant depo. at pp. 363-364.  After completing its investigation, the EEOC dismissed the charge.  Id. at 365-366.

## II.  Legal Standard

Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute.  It may be rendered only when appropriate evidentiary materials, as described in Fed. R. Civ. P. 56(c), demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law. Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464 (1962).  The moving party bears the burden of demonstrating that no material facts are in dispute, and the evidence submitted must be viewed in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).  Additionally, the Court must draw all reasonable

4

inferences from that evidence in favor of the nonmoving party.  United States v. Diebold, Inc., 369 U.S. 654 (1962). The nonmoving party does have the burden, however, after completion of sufficient discovery, to submit evidence in support of any material element of a claim or defense on which that party would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  Of course, since "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, the responding party is only required to respond to those issues clearly identified by the moving party as being subject to the motion.  It is with these standards in mind that the instant motion must be decided.

### III. Analysis

#### A. Title VII Race Discrimination

Under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq., every individual seeking employment, seeking advancement in employment, or being considered for termination of his or her employment, is entitled to be judged by, inter alia, racially or gender-neutral employment standards and practices. The Supreme Court established a framework for evaluating Title VII claims in McDonnell-Douglas v. Green, 411 U.S. 792, 799 (1973).  According to that decision, an individual can demonstrate a prima facie case of discrimination by showing the following:

    (1)  Membership in a protected class;
    (2)  Having made application, and being qualified,

>       for a job for which the employer sought applicants,
>       or being qualified either to continue in employment
>       or for a promotion;
>
> (3)   An adverse job action such as failure to hire,
>       failure to promote, demotion or termination; and
>
> (4)   Replacement by someone outside the protected class or
>       treatment different from that of similarly-situated,
>       non-protected employees.

Id. at 802.

Once a Title VII claimant has made the prima facie showing described above, the burden of producing evidence shifts to the employer. The employer is required to articulate with some precision a legitimate, non-discriminatory reason for the adverse job action taken. Once such a reason is articulated, the claimant is then obligated to persuade the Court either that the reason given was insufficient to support the adverse job action, or that it was not the real reason that the action was taken. An employer may not use a purportedly non-discriminatory reason for an adverse job action as a pretext for racial discrimination. Id. at 804. However, the burden is on the plaintiff to prove that a reason is pretextual by a preponderance of the evidence, a burden which is consistent with the plaintiff's ultimate burden of persuasion in a Title VII case. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981). Once a plaintiff has established a prima facie case, and the employer has articulated a sufficiently specific and facially legitimate, non-discriminatory reason for its action, all presumptions drop out of the case, and the action is decided in the same manner as any other civil action. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 715 (1983).

Several additional legal principles also apply. First, a plaintiff may, but need not, present direct evidence of an intent to discriminate. Id. at 717. If direct evidence of

discrimination is presented, the McDonnell-Douglas analysis of a prima facie case is inapposite. Bartlett v. Gates, 421 Fed.Appx. 485, 487 (6th Cir. 2010). Otherwise, the plaintiff can make a circumstantial case of discrimination through the McDonnell-Douglas prima facie case and through additional evidence that the non-discriminatory reason advanced by the defendant is merely a pretext. See, e.g., Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co., 783 F.2d 50 (6th Cir. 1986); Henry v. Lennox Industries, Inc., 768 F.2d 746 (6th Cir. 1985). Such evidence can include statistical evidence or evidence as to the employer's general policies or practices relating to minority employment. McDonnell-Douglas, supra, at 804-05. A showing that an employer's standard operating procedure for employment decisions, generally, involved racial discrimination is evidence probative of its intent against a particular employee or applicant in a particular hiring context. Bazemore v. Friday, 478 U.S. 385 (1986)(per curiam).

It bears noting that Title VII does not prohibit illogical or unsound hiring decisions, but only those which are improperly motivated by race or other suspect classification. If the employer's true reason for acting is irrational, but the trier of fact is ultimately not persuaded that it is merely a pretext for an unlawful discriminatory decision, relief is not available under Title VII:

> "It is enough for the defendants...to bring forth evidence that they acted on a neutral basis. They do not have the burden of establishing that their basis was sound; rather, the burden then falls on the plaintiff to demonstrate that it is pretextual."

Lieberman v. Gant, 630 F.2d 60, 65 (2nd Cir. 1980). Even if the plaintiff proves pretext, the trier of fact retains the discretion to find an absence of discrimination. A finding that

7

the proffered reasons for the employer's actions are not the real reasons permits, but does not require, the Court to find in plaintiff's favor.  St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).  Nevertheless, when there is evidence from which the trier of fact could find that the proffered reasons are pretextual, summary judgment in the employer's favor is ordinarily not appropriate.  See Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078 (6th Cir. 1994) overruled on other grounds by Geiger v. Tower Automotive, 579 F.3d 614 (6th Cir. 2009).

    With respect to the claim of racial discrimination, Target argues that Mr. Grant does not set forth direct evidence of discrimination, so his claim is required to be analyzed under the McDonnell-Douglas framework.  Target contends that, applying this framework, Mr. Grant cannot establish a prima facie case for two reasons.  First, Target asserts that Mr. Grant was not qualified for his position because of performance and attendance issues.  Further, Target maintains that Mr. Grant cannot show that he was treated less favorably than similarly situated non-African American employees.

    Mr. Grant does not address his racial discrimination and retaliation claims separately in his summary judgment response, but the Court considers his arguments as they relate to both claims.  With respect to Target's argument that he was not qualified for his position, Mr. Grant contends that while he had "numerous attendance violations", he was one of Target's best workers.  According to Mr. Grant, his experience and knowledge in numerous areas were recognized by management.  As Mr. Grant explains he trained other team members, answered operational questions, followed safety procedures, kept his work area clean, identified quality errors, and dealt timely with problem freight.  With respect to the issue of less favorable treatment, Mr. Grant

8

mentions Paul Fox as a "Caucasian in the same leadership position as the only other trainer besides the Plaintiff supervised by Mark Nealon."  Mr. Grant does not appear to argue, for purposes of his racial discrimination claim, that he was treated less favorably than Mr. Fox relating to attendance or performance issues.  Rather, Mr. Grant seems to rely on Mr. Fox for corroboration that he received increasingly difficult job assignments following his reporting of the graffiti.  This argument seems to be directed to Mr. Grant's retaliation claim and will be discussed later.  In support of his response, Mr. Grant has submitted three exhibits - an affidavit from Mr. Fox, a typed, unsigned document dated July 23, 2009, which appears to have been prepared by Mr. Grant, and the second page of Mr. Woodring's affidavit as submitted by Target.  Technically, the Court cannot consider the unsworn statement because Fed.R.Civ.P. 56(c) requires affidavits or declarations, or other sworn testimony, to be submitted in connection with a summary judgment motion, but, as the following discussion shows, it would not matter if the statement had been sworn, because it does not create a genuine issue of fact about whether Mr. Grant has made out a prima facie case of either discrimination or retaliation.

  In this case, a prima facie case has not been made out not because Mr. Grant was not qualified for the position - under the decision in Cline v. Catholic Diocese of Toledo, 206 F.3d 651 (6th Cir. 2000), he probably was - but because Mr. Grant has not presented any evidence that he was treated less favorably than similarly situated non-African American employees.  In order to demonstrate that a non-protected employee is similarly situated, Mr. Grant must show that all of the "relevant aspects of his employment situation were nearly identical to those of the non-protected employee." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1988), quoting Pierce v. Commonwealth

9

Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994).  That is, '"the individuals with whom [Mr. Grant] seeks to compare himself must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Id., citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).  Not only has Mr. Grant failed to provide any evidence directed to the issue of less favorable treatment, his deposition testimony actually supports the opposite proposition.  According to Mr. Grant's testimony, Caucasian employees also were disciplined and terminated for repeated attendance violations and both African-American and Caucasian employees complained about bad job assignments.  (Tr. 254, 276).  In short, there is nothing in this record which would allow a reasonable judge or jury to conclude that, if only Mr. Grant had been Caucasian instead of African-American, he would not have been disciplined and then fired for reasons relating to attendance and productivity.  Without that kind of evidence, a Title VII discrimination claim simply cannot get to a jury, and there is no need for the Court to consider any of the other elements of a prima facie case or to evaluate Target's stated reason for terminating Mr. Grant.  Even if that reason was less than credible - because, for example, Target did, as Mr. Grant claims, give him an assignment on January 24, 2009 which he could not complete in a reasonable time because the dock was cluttered with other freight - no juror could find that Target's real reason for firing him was his race, because the jury would never get to that question. See, e.g., Khan v. United Recovery Systems, Inc., 2005 WL 469603. *21 (S.D. Tex. Feb. 28, 2005)(where a plaintiff has not presented enough evidence to create an inference of discrimination, "[t]he court need not proceed any further than the prima facie stage" and should grant

10

summary judgment on the claim); see also Jones v. Union Pacific R. Co., 302 F.3d 735, 741 (7th Cir. 2002) ("establishing a prima facie case - which the plaintiff must do by a preponderance of the evidence - is a condition precedent to the pretext analysis") - by which the Court of Appeals meant that if the prima facie case is not established, there is no need to get into the question of the reasons given for the firing and whether they were pretextual (that is, not the real reasons).

It is also important to remember that Title VII and other similar statutes were designed to protect employees against certain kinds of discrimination, rather than the universe of unfair or unwise decisions made by employers.  "It is not enough for the plaintiff to show that the employer made an unwise business decision, or an unnecessary personnel move. Nor is it enough to show that the employer acted arbitrarily or with ill will." Gray v. New England Tel. and Tel. Co., 792 F.2d 251, 255 (1st Cir. 1986).  Some facts from which a jury could find, in this case, that Target was motivated at least in part by Mr. Grant's race, must be presented to the Court in order for this case to go to trial.  For the reasons stated in this Opinion, the Court simply does not find those facts in this record.

### B.  Retaliation under Title VII

A plaintiff alleging retaliation must also begin by proving a prima facie case - that is, facts from which someone could reasonably infer that retaliation has occurred.  In order to prove a prima facie case of retaliation under Title VII, a plaintiff must prove four elements: (1) the plaintiff engaged in activity protected by Title VII; (2) the defendant knew about this fact; (3) the defendant took adverse action against the plaintiff; and (4) the protected activity and the adverse action were causally connected.  Taylor v. Geithner, 703 F.3d 328, 336 (6th Cir. 2013); Arendale v. City of Memphis, 519 F.3d 587, 606

(6th Cir. 2008); Russell v. Univ. of Toledo, 537 F.3d 596, 609 (6th Cir. 2008); Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000)). A plaintiff "easily" makes out a prima facie case of retaliation. Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 523 (6th Cir. 2008); McClain v. NorthWest Cmty. Corr. Ctr. Judicial Corr. Bd., 440 F.3d 320, 335 (6th Cir. 2006) (citation omitted). Once a plaintiff has made out a prima facie case of retaliation, the burden of production shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse action. Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007). If the employer satisfies this obligation, the burden of production shifts back to the plaintiff to show "that the proffered reason was not the true reason for the employment decision." Id., quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). The burden of persuasion, however, always remains on the plaintiff. Morris v. Oldham County Fiscal Ct., 201 F.3d 784, 793 (6th Cir. 2000). It is with these guiding principles in mind that the facts of this particular case are analyzed.

    Here, Target asserts that Mr. Grant cannot demonstrate a causal connection between his reporting of racial graffiti and his termination eighteen months later for several reasons. First, Mr. Grant received corrective action relating to his attendance violations prior to reporting the graffiti and as early as January, 2006. Further, Mr. Grant complained about receiving bad job assignments prior to July, 2007. Additionally, other employees, both Caucasian and African-American, complained about bad job assignments. Finally, because of the eighteen-month lapse, there is not sufficient temporal proximity between the events.

    As the Court understands Mr. Grant's retaliation claim, he contends that following his report of the graffiti, he was given

12

increasingly difficult job assignments culminating in the assignment which led to his termination in 2009.  Thus, in his view, the retaliatory acts started fairly soon after the 2007 incident and simply continued to 2009, making it reasonable to infer that there was a long pattern of retaliation that began when he reported the racial graffiti.  The Court cannot agree.

To establish a causal connection for a retaliation claim, a plaintiff "'must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects.'" Taylor, 703 F.3d, at 339, quoting Abbott v. Crown Motor Co., Inc., 348 F.3d 537, 543 (6th Cir. 2003).  "'Accordingly, at the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible.'" Id., quoting Nguyen, 229 F.3d at 566.  A plaintiff can demonstrate a causal connection by showing close temporal proximity between the adverse employment action and the protected activity.  Id., citing Upshaw v. Ford Motor Co., 576 F.3d 576, 588 (6th Cir. 2009).  Evidence beyond temporal proximity is required only when "some time has passed." Id., citing Mickey, 516 F.3d at 525.  That is, if there is a very close temporal proximity, then no other evidence is needed.  Id.  The causal connection element is generally satisfied where the adverse action occurred within a matter of months, or less, of the protected activity.  Dye v. Office of the Racing Com'n, 702 F.3d 286, 306 (6th Cir. 2012)(lapse of two months sufficient to show causal connection); see also Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 283 (6th Cir. 2012)(three weeks and less than two months); Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007)

13

(three months); Singfield v. Akron Metro. Housing Auth., 389 F.3d 555, 563 (6th Cir. 2004) (three months).

In this case, Mr. Grant has not presented any evidence to demonstrate a causal connection between his report of racial graffiti and his termination eighteen months later.  He may truly believe that his complaint eventually led to his being fired, but his unsupported opinion cannot substitute for some proof that a jury could rely on in making such a finding.  Here, the fact that there was an eighteen-month lapse between the complaint and the firing precludes Mr. Grant from establishing causation through "close temporal proximity."  See Taylor, 703 F.3d , at 339; Dye, 702 F.3d, at 306.  As the Court of Appeals for the Ninth Circuit explained in Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002), "[a] nearly 18-month lapse between protected activity and an adverse employment action is simply too long, by itself, to give rise to an inference of causation." That means that if the jury were told only that Mr. Grant complained about racial graffiti in July of 2007 and that he was fired in January of 2009, the jury could not, as a matter of law, find that the two events were connected.  Consequently, in order to make out a case for the jury that these events were connected, Mr. Grant had to produce some additional evidence to support that claim.

Here, the evidence in the record refutes, rather than supports, any suggestion of a causal connection.  Mr. Grant's disciplinary records document attendance violations beginning as early as January, 2006.  Further, Mr. Grant testified at his deposition that he complained about bad work assignments from at least one supervisor or group leader prior to his reporting of racial graffiti in July, 2007.  Consequently, it would not be reasonable (and therefore not permissible) for a juror to infer that the recurrence of same type of problems after July, 2007

14

suddenly became retaliatory.  Other courts agree with this analysis; for example, in Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001), the Court of Appeals for the Second Circuit stated that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."

Again, the Court acknowledges Mr. Grant's argument that the final event - his supposed failure to complete his work in a timely fashion on January 24 2009 - was simply engineered by Target in order to create a reason to fire him.  If the Court were to believe his unsworn statement about that evening, and draw inferences from Mr. Fox's affidavit, it might be that an argument could be made that Mr. Grant's supervisor was aware of the congested situation on the dock and that it was going to prevent Mr. Grant from doing his work as quickly as Target claimed to have expected.  But even if there is some argument about that, it is not relevant; once the Court finds that a jury could not decide the question of whether Target fired him because of his 18-month-old complaint about racial graffiti in Mr. Grant's favor, the retaliation case is over, and Target would not need even to state the reasons for its actions, let alone defend them against a claim that they were concocted rather than genuine.  See Duron v. United States Department of Agriculture, 2008 WL 5000113, *9 (N.D. W.Va. Nov. 20, 2008)(where "the plaintiff has failed to make a prima facie case of retaliation under Title VII ... the defendant's motion for dismissal as well as the defendant's motion for summary judgment must therefore be granted").

### C.  The Ohio Law Claims

Turning to Mr. Grant's race discrimination claim under Ohio law, both Sixth Circuit and Ohio Supreme Court precedent hold

that such claims, brought under Title VII and Ohio Revised Code Section §4112, are analyzed the same.  Consequently, summary judgment on Mr. Grant's race discrimination claim under federal law requires a similar conclusion under Ohio law.  <u>See</u>, <u>e.g.</u>, <u>Cincinnati Bar Ass'n. v. Young</u>, 89 Ohio St.3d 306, 315 (2000) (stating that it is the practice of the Ohio courts, "where appropriate, to refer to federal case law interpreting Title VII" when analyzing discrimination claims brought under O.R.C. §4112) and <u>Myers v. Cuyahoga County, Ohio</u>, 182 Fed.Appx. 510, 517, 2006 WL 1479081, *4 (6th Cir. 2006).

Finally, the Court notes Target's assertion that, to the extent Mr. Grant's deposition testimony could be construed as an intention to assert a "wrongful termination" or wrongful discharge claim, he has not set forth such a claim in his complaint or any proposed amended complaint.  Further, Target contends that Mr. Grant has not identified any public policy violated by Target in terminating his employment.  While there is brief reference to a "wrongful termination" claim in Mr. Grant's summary judgment response, courts typically have held that because Title VII and Ohio Revised Code Chapter 4112 provide remedies for claims of employment discrimination and retaliation, there is no reason to allow a plaintiff to pursue a tort claim for wrongful discharge in violation of public policy.  <u>See</u>, <u>e.g.</u>, <u>Stange v. Deloitte & Touche</u>, 2006 WL 871242, *5 (S.D. Ohio 2006)(Holschuh, J.).  For this reason, the Court does not construe Mr. Grant's use of this term as indicating his intention to pursue such a claim.

### IV.  Remaining Motions

Also pending before the Court is Target's motion to dismiss the amended complaint against the individual defendants under Rule 12(b)(5) for failure to timely effect service.  Mr. Grant responded to this motion asserting that he can demonstrate good

16

cause for his failure to do so. Because the motion for summary judgment will be granted as to all of his claims, the Court will not consider Mr. Grant's assertions of good cause for extending the time for service. Consequently, the motion to dismiss as to the individual defendants will be granted.

Further, Mr. Grant filed a motion to compel directed to Target's responses to his first set of interrogatories and request for production of documents. The motion to compel addresses thirteen interrogatories and two requests for production. In this motion, Mr. Grant restates the particular interrogatories and requests for production and sets forth his disagreement with the truthfulness of portions of Target's responses. Mr. Grant provides no indication in his motion that he attempted to confer with counsel for Target prior to filing his motion to compel as required under Fed.R.Civ.P. 37(a)(1) and this Court's Local Civil Rules. See Local Civil Rules 37.1 and 37.2. Mr. Grant's status as a *pro se* litigant does not relieve him from adhering to these rules. See McNeil v. U.S., 508 U.S. 106, 113 (1993). Further, a motion to compel is not the correct way for Mr. Grant to argue about the factual accuracy of Target's responses. Additionally, the Court notes that Mr. Grant did not request additional time to respond to the summary judgment motion based on the motion to compel. He did suggest that some photographs, which he claims Target did not produce, would have helped him prove his case, but there are photographs of racial graffiti attached to Target's filings and the Court has assumed for purposes of this motion that Mr. Grant saw such graffiti and reported it. The photos would not add anything to the record which is not already here. For these reasons, the motion to compel will be denied as moot. Similarly, the motion to strike will be denied as moot.

Finally, Target has moved to strike Mr. Grant's response to

their reply.  Because Mr. Grant filed his response without seeking leave of Court, Target's motion to strike will be granted.

## V. Conclusion

The motion for summary judgment (#87) and the motion to dismiss (#77) are granted.  The motion to strike (#93) is granted.  The motion to compel and the motion to strike (#84, #85) are denied as moot.  This case is dismissed.  The Clerk is directed to enter judgment in favor of the defendant.

/s/ Terence P. Kemp
United States Magistrate Judge